UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

Nº 12-CV-3146 (JFB)(SIL)

———————————

GANESH JAGMOHAN,

Plaintiff,

VERSUS

LONG ISLAND RAILROAD COMPANY D/B/A MTA LONG ISLAND RAILROAD, METROPOLITAN TRANSIT AUTHORITY, AND VINCENT ANDREOTTI, DANIEL CLEARY, CRAIG DALY, MICHAEL FYFFE, MICHAEL GELORMINO, JAMES GIALLORENZO, MARILYN KUSTOFF, CATHERINE LOPRESTI, EILEEN RODRIGUEZ, MARGARET TALALAJ, AND ROBERT TOOLAN, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AND AS AIDERS AND ABETTORS,

Defendants.

———————————

**MEMORANDUM AND ORDER**
September 8, 2014

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Ganesh Jagmohan ("Jagmohan" or "plaintiff") brings this action against defendants The Long Island Railroad Company ("LIRR"), the Metropolitan Transportation Authority ("MTA"),[1] and eleven individual defendants employed by the LIRR—Vincent Andreotti, Daniel Cleary, Craig Daly, Michael Fyffe, Michael Gelormino, James Giallorenzo, Marilyn Kustoff, Catherine Lopresti, Eileen Rodriguez, Margaret Talalaj, and Robert Toolan—, alleging violations of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*, the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-107 *et seq.*, and 42 U.S.C. § 1983. Plaintiff, a former manager at the LIRR, claims the LIRR and MTA discriminated against him on the basis of race and national origin and retaliated against him for complaining about the discrimination, and that the individual defendants aided and abetted the allegedly unlawful conduct. He also claims defendants retaliated against him when he spoke out about matters of public concern, in violation of his First

---

[1] The MTA is named in the complaint as "Metropolitan Transit Authority."

Amendment rights. Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposes, except that he withdraws his claims against the MTA and his claim for punitive damages.[2] For the reasons set forth below, the Court grants defendants' motion for summary judgment on the federal claims, and declines to exercise supplemental jurisdiction over the state claims.

With respect to his Title VII claim, asserting that his failure to be promoted in late 2011 and early 2012 was discriminatory, it is uncontroverted that (1) LIRR policy prohibits the selection to open positions of employees who have been disciplined within the prior three years, and (2) plaintiff was disciplined in September 2010. Plaintiff fails to cite any instance where LIRR has deviated from this policy. Moreover, to the extent plaintiff attempts to argue that the underlying discipline in 2010 was unfair or discriminatory, it is uncontroverted that, in September 2010, he sent an email to a supervisor which stated, *inter alia*, "I am aggravated with you 'talking the talk but not walking the walk.' You are a smart man. You already know all of my concerns. For God sake! You are the [Deputy General Manager ("DGM")], take responsibility for the operation. We know you and I have different management style. I don't manage by making deals. Now that the deals are gone, I sense you don't know what to do. Maybe that [sic] why you have been acting that way lately." By the time plaintiff sent this email, the supervisor also had received complaints about plaintiff from others, including (1) the union representative, claiming that plaintiff talked down to employees; and (2) manager Dominick D'Antonio, claiming that plaintiff had verbally assaulted him and accused him of lying, being in bed with the union, and being just like another DGM, Toolan. Thus, there is simply no evidence from which a rational jury could find that the underlying discipline, or the failure to promote because of that discipline, were discriminatory.

With respect to his Title VII claim based upon the termination, it is uncontroverted that an employee plaintiff was supervising complained in October 2012 that, *inter alia*, plaintiff yelled at him, called him a "f***ing baby," motioned at him with both hands, and tried to force him into a physical altercation. The employee said that it got so bad that he texted the word "help" to another employee. Plaintiff argues that the complaints were without merit, but concedes that the complaints were made. Thus, there is no evidence from which a rational jury could find the employer's decision to credit the serious complaints was discriminatory. Similarly, the Title VII retaliation claim cannot survive summary judgment. As discussed above, defendants have articulated the reasons for their adverse actions, and plaintiff cannot point to any evidence, other than temporal proximity, to support his claim of retaliation. Temporal proximity, however, alone is insufficient to allow a claim to survive summary judgment, especially given the uncontroverted evidence of the complaints about plaintiff's conduct by others.

Finally, the § 1983 retaliation claim cannot survive summary judgment, because the uncontroverted evidence demonstrates that, under the applicable Supreme Court and Second Circuit standard, plaintiff spoke as a public employee, rather than as a private citizen, when he complained to others within the LIRR about the allegedly preferential treatment being given to a snow removal vendor—information plaintiff

---

[2] Accordingly, the Court dismisses the MTA from this action and grants summary judgment to the LIRR on the punitive damages claim.

claimed to have obtained while working in the LIRR's Babylon yard.

I. BACKGROUND

A. Factual Background

The Court takes the following facts from the parties' affidavits, depositions, exhibits, and Rule 56.1 Statements of Fact. The Court construes the facts in the light most favorable to the nonmoving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Although the Rule 56.1 statements contain specific citations to the record, the Court cites to the statements rather than to the underlying citations. Unless otherwise noted, where a Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record.

Plaintiff is of East Indian ethnic background and emigrated from Guyana at age ten. (Pl. 56.1 ¶ 1.) He began working for the LIRR in 2007. (Def. 56.1 ¶ 2.)

From February 2007 through June 2008, plaintiff worked as a general foreman in the LIRR's Jamaica Central Control. (*Id.* ¶ 3.) In November 2007, plaintiff complained to Lopresti, the Deputy General Manager ("DGM") of Field Operations and Central Control, and Daly, another DGM, about unprofessional conduct of a sexual nature against plaintiff by Jenelle Sasco. (Pl. 56.1 ¶ 3.) In May 2008, plaintiff complained about inappropriate sexual conduct against a third party by Mario Diliberti. (*Id.*) Sasco, meanwhile, apparently complained that plaintiff attempted to intimidate her, raised his voice at her, and pounded his fist on the table. (Def. 56.1 ¶ 4.) Daly did not believe that plaintiff did what Sasco claimed. (Pl. 56.1 ¶ 4.)

Shortly after plaintiff complained about Diliberti in May 2008, management reassigned plaintiff to the Babylon yard, in part to broaden his experience. (Def. 56.1 ¶ 5.) Daly testified that plaintiff's "particular talents and the needs at Babylon" and the fact that "it was a good learning experience" prompted the transfer, which was "accelerated" to May 2008 "based [off] the [Sasco] incident, because [Sasco] was still in the workplace." (Daly Dep. at 36:6–22, Docket No. 26-8.) According to plaintiff, Babylon was farther from his home than Jamaica, there were issues with the equipment and unionized employees in Babylon, and he was required to do the work of multiple master mechanics while in Babylon. (Pl. 56.1 ¶ 5.) Plaintiff also was responsible for the supervision of a toilet servicing contract. (Def. 56.1 ¶ 6.) That May, plaintiff applied for a promotion to Master Mechanic. (*Id.* ¶ 7.) Although he was promoted in February 2009, other employees were promoted in November 2008. (*Id.* ¶¶ 8–9.)

On June 5, 2009, plaintiff complained to his supervisor about race and national origin discrimination. (Jagmohan 03/22 Dep. at 80:8–14.) The record does not indicate the specific basis for the complaint. Plaintiff asserts that, shortly thereafter, plaintiff was told to sign off on train cars being safe for service despite the fact that they had leaking gear cases. (Def. 56.1 ¶ 11.) According to plaintiff, federal and stringent LIRR requirements prevented him from signing off on the leaking gear cases. (Pl. 56.1 ¶ 12.) Plaintiff's supervisors, on the other hand, believed that if a gear case was wiped down so that there was no more oil on the leads, the train car could be operated. (Def. 56.1 ¶ 13.) Plaintiff testified that, on June 18, 2009, during a meeting regarding these issues with Lopresti and Gelormino, a Chief Mechanic Officer, plaintiff told Lopresti that she was discriminating and retaliating against him when she criticized his

3

performance. (*Id.* ¶ 14; Jagmohan 03/22 Dep. at 100:18–101:21, 103:3–16.)

In September 2009, plaintiff spoke to Toolan, the DGM, about an internal request sheet indicating that snow removal vendor DeLuca Landscaping ("DeLuca") was on the property on a certain date, even though DeLuca had not been on the property. (Def. 56.1 ¶ 15.) Plaintiff does not know if DeLuca was paid for work on that date. (*Id.*) Plaintiff also claims that on, December 18, 2009, Toolan ordered DeLuca to pre-salt certain yards before a snowstorm, and that plaintiff objected because the DeLuca contract did not call for pre-salting. (*Id.* ¶ 17.) Plaintiff does not know if DeLuca was paid for the pre-salting. (*Id.*) Plaintiff then advised Toolan during January 2010 that DeLuca was overbilling the LIRR. (*Id.* ¶ 20.) Plaintiff also emailed Lopresti to complain about Toolan's handling of the DeLuca contract. (*Id.* ¶22.) Lopresti referred plaintiff to Kustoff, the Maintenance of Equipment Department's Manager of Trials, Investigations, and Grievances. (*Id.*) Plaintiff claims that, during his meeting with Kustoff, he complained of race discrimination and retaliation. (*Id.* ¶ 23.) Subsequently, in February 2010, Daly, Toolan, and other managers criticized plaintiff's toilet operation performance, and in June 2010, Toolan began questioning plaintiff's toilet servicing expenditures. (*Id.* ¶ 24.) In March 2010, plaintiff was assigned to manage technical support supervisors. (*Id.* ¶ 25.) Plaintiff also was assigned to the night shift for five months. (*Id.* ¶ 26.)

On September 4–5, 2010, plaintiff and Toolan exchanged several emails. (*Id.* ¶¶ 27–28.) In one email, plaintiff wrote, "Yes Bob. I am aggravated with you 'talking the talk but not walking the walk.' You are a smart man. You already know all of my concerns. For God sake! You are the DGM, take responsibility for the operation. We know you and I have different management style. I don't manage by making deals. Now that the deals are gone, I sense you don't know what to do. Maybe that [sic] why you have been acting that way lately." (*Id.* ¶ 28.) By the time plaintiff sent these emails, Lopresti had received complaints about plaintiff from others, including (1) the union representative, claiming that plaintiff talked down to employees; and (2) manager Dominick D'Antonio, claiming that plaintiff had verbally assaulted him and accused him of lying, being in bed with the union, and being just like Toolan. (*Id.* ¶ 29.) Lopresti asked Kustoff to help prepare a discipline letter. (*Id.* ¶ 30.) That letter, dated September 29, 2010, and signed by Lopresti, noted plaintiff's response to Toolan's September 4, 2010 directive and explained that plaintiff's "defiant, insubordinate and unprofessional behavior" was counterproductive. (*Id.* ¶ 30.) Lopresti wrote that she had lost confidence in plaintiff's ability to work with Toolan in a productive manner and that, in the interest of the smooth operation of the department, she had decided to transfer plaintiff back to Central Control. (*Id.*) Plaintiff suffered no loss of pay or benefits or change in title, and returned to the day shift. (*Id.*)

On November 3, 2010, plaintiff and his former counsel met with LIRR representatives to discuss plaintiff's discrimination complaints. (*Id.* ¶ 31.) Plaintiff's counsel sent a more detailed document on December 1, 2010, and filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 24, 2011. (*Id.*) Plaintiff received a right to sue notice from the EEOC on March 29, 2012. (*Id.* ¶ 40.)

On or about May 4, 2011, plaintiff and other employees were reassigned as part of a large intradepartmental move. (*Id.* ¶ 32.) As part of that move, plaintiff moved to the

Plant Equipment Maintenance Division ("PEMD") section. (*Id.*) According to defendants, plaintiff was moved to PEMD because of his strong technical background and attention to detail, and the move was meant to give him valuable experience. (*Id.* ¶ 33.) Cleary, the head of the section that included the PEMD, was looking for a technical person to join the group. (*Id.*) Plaintiff admits that defendants believed that plaintiff had those skills. (Pl. 56.1 ¶ 33.) Plaintiff's title, pay, and hours did not change. (Def. 56.1 ¶ 34.)

Plaintiff alleges that, on May 24, 2011, he complained to his new supervisor, Andreotti, about discrimination and retaliation, and that, on May 30, 2011, he advised Cleary and Andreotti about his complaints of race discrimination and retaliation. (*Id.* ¶ 35.) Further, on May 31, 2011, plaintiff complained to Talalaj, who worked in Human Resources, about discrimination, and in November 2011, he told Andreotti that he would not go to Lopresti's retirement party because she did not like him because of his race. (*Id.* ¶ 35.)

Plaintiff applied for a DGM position in December 2011. (*Id.* ¶ 36.) According to defendants, LIRR policy prohibits the selection to open positions of employees who have been disciplined within the prior three years. (*Id.* ¶ 37.) Thus, because plaintiff had been disciplined on September 29, 2010, he was ineligible for the position. (*Id.* ¶ 38.)

In October 2011, plaintiff began supervising General Foreman Joseph Giannotti. (*Id.* ¶ 43.) On October 23, 2012, Giannotti complained to Kustoff that earlier that day, plaintiff yelled at him, called him a "f***ing baby," motioned at him with both hands, and tried to force him into a physical altercation. (*Id.* ¶ 44.) Giannotti said that it got so bad that he texted the world "help" to Andreotti.[3] (*Id.*) Kustoff conducted an investigation. She interviewed Giannotti, who said that (1) plaintiff aggressively questioned him on October 17 about issues related to plaintiff's lawsuit; (2) when Giannotti said he did not want to be part of the lawsuit, plaintiff told Giannotti that he was not fulfilling his duties; (3) Giannotti decided to leave railroad management because the environment had become too hostile; (4) when plaintiff heard about this, he yelled, pointed at Giannotti, and called him a "f***ing baby"; and (5) while yelling, plaintiff cornered Giannotti, motioned to him with both hands, and said, "Come on you f***ing baby, bring it, I need it for my lawsuit." (*Id.* ¶ 46.) Giannotti also said that plaintiff had told him he was too fat, made cracks about Giannotti's ethnicity, and said he should know about the mafia because he was Italian.[4] (*Id.* ¶ 47.) Plaintiff admits that Giannotti made these accusations, but claims that the underlying events did not occur. (Pl. 56.1 ¶¶ 44–47.) Kustoff also interviewed plaintiff and other individuals. (Def. 56.1 ¶ 50.) Assistant Superintendent Barry Tuma said that on several occasions, plaintiff mentioned that many people named in the lawsuit have last names that begin with vowels and that Giannotti had "man boobs." (*Id.*) Plant Engineer Fred Backhaus said that plaintiff, when speaking with Giannotti, referred to the Mafia and names ending in vowels, and used the word "guinea," an Italian slur. (*Id.*) Plaintiff disputes these

---

[3] Plaintiff claims that Fyffe, Andreotti, and Kustoff—defendants in the present action by that time—were present or on the phone when Giannotti made those accusations. (Pl. 56.1 ¶ 46.)

[4] Giannotti filled out an internal discrimination complaint on October 25, alleging that plaintiff said, *inter alia*: (1) "if you are not Italian you will go nowhere on the LIRR. You know what I mean Rock"; (2) "The snow removal contract is controlled by the Mafia. You know all about the Mafia, don't you Rock?"; and (3) made cracks about Giannotti's weight and physical condition. (Def. 56.1 ¶ 49.)

allegations and claims that Kustoff did not interview individuals plaintiff had named as witnesses. (Pl. 56.1 ¶ 50.) During the investigation, both plaintiff and Giannotti were taken out of service with pay. (Def. 56.1 ¶ 53.) Following the investigation, plaintiff was terminated. (*Id.* ¶ 54.)

The LIRR has an anti-harassment policy that prohibits harassment in the work place based upon, among other things, national origin, and gives examples of prohibited conduct including demeaning, derisive, or hostile comments toward an individual or group based on membership in a protected class. (*Id.* ¶ 51.) The LIRR's Maintenance of Equipment Department also maintains a code of conduct that requires employees to treat other employees with respect and prohibits fighting. (*Id.* ¶ 52.)

B. Procedural Background

Plaintiff filed the complaint on June 22, 2012, and the second amended complaint on November 14, 2012. Defendants moved for summary judgment on October 14, 2013. Plaintiff opposed on December 31, 2013. Defendants replied on January 12, 2014. The Court held oral argument on January 27, 2014. The Court has fully considered the submissions of the parties.

II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R.*

*Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

Plaintiff alleges that defendants (1) discriminated against him on the basis of his race and national origin, in violation of Title VII, the NYSHRL, and the NYCHRL; (2) retaliated against him for his discrimination complaints; and (3) retaliated against him when he complained about the DeLuca contract, in violation of his First Amendment rights. The Court addresses each claim in turn.

#### A. N.Y. Labor Law § 740 Claim

In his original complaint, plaintiff asserted a claim under New York Labor Law § 740. (Def. 56.1 ¶ 41.) Section 740, known as the "Whistleblower Statute," prohibits an employer from taking "any retaliatory personnel action against an employee" for, *inter alia*, "disclosing to a supervisor or public body an illegal activity that constitutes a danger to the public health or safety, testifying to an investigating public body, or objecting to an illegal policy or practice." N.Y. Lab. Law § 740(2). Section 740(7) provides that "the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law." Although plaintiff's second amended complaint omits this cause of action, defendants argue that its inclusion in the original complaint waives the other claims.

The Second Circuit recognizes that

> courts have adopted differing and sometimes contradictory limiting constructions of this waiver. New York state courts have generally held that the waiver applies to all causes of action that relate to the retaliatory discharge, which may include contract claims, tort claims, and claims arising under state antidiscrimination laws. Federal district courts, in contrast, generally interpret the waiver as applying only to rights and remedies concerning whistleblowing, and therefore deem it not to apply, for example, to claims of employment discrimination. Additionally, federal courts have interpreted the provision not to waive or otherwise affect rights arising under federal law.

*Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 134 (2d Cir. 2007) (internal quotation marks and citations omitted). Some courts have suggested that the inclusion of a § 740 claim triggers the waiver even if the claim is facially defective or is promptly withdrawn. *See, e.g.*, *Hayes v. Staten Island Univ. Hosp.*, 834 N.Y.S.2d 274, 275 (N.Y. App. Div. 2007) (holding that plaintiff could not proceed on contract claim even after withdrawing § 740 claim); *Pipia v. Nassau Cnty.*, 826 N.Y.S.2d 318, 320 (N.Y. App. Div. 2006) (dismissing claims related to termination where plaintiff had alleged violation of § 740 in original complaint because commencement of action under § 740(4) waived other causes of action relating to alleged retaliatory discharge).

The Second Circuit's discussion in *Reddington* weighs against a finding that the federal discrimination claims in plaintiff's second amended complaint are barred because he included a § 740 claim in the original complaint. The Court also notes that the claim arguably would have been deficient because § 740 does not apply to public employers such as the LIRR. *See Dibiase v. Barber*, No. CV 06-5355(AKT),

2008 WL 4455601, at *5 (E.D.N.Y. Sept. 30, 2008) (citing cases); *Tamayo v. City of New York*, No. 02 Civ. 8030(HB), 2004 WL 137198, at *7 (S.D.N.Y. Jan. 27, 2004) (dismissing retaliation claim brought by police detectives under Section 740); *Katzowitz v. Long Island R.R.*, 58 F. Supp. 2d 34, 37 (E.D.N.Y. 1999) (LIRR is a public entity). In any event, the Court concludes that it is not necessary to decide this issue because, as discussed below, plaintiff's federal claims cannot survive summary judgment on their merits.

### B. Title VII Claims

Defendants argue that summary judgment is appropriate on the Title VII discrimination and retaliation claims because several of plaintiff's allegations are time-barred, and plaintiff cannot establish prima facie cases of discrimination or retaliation, much less show pretext.

#### 1. Time-Barred Actions

An "aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act." *Petrosino v. Bell Atl.*, 385 F.3d 210, 219 (2d Cir. 2004); 42 U.S.C. § 2000e–5(e). Title VII "precludes recovery for *discrete* acts of discrimination . . . that occur outside the statutory time period, irrespective of whether other acts of discrimination occurred within the statutory time period." *Mark v. Brookdale Univ. Hosp.*, No. 04 Civ. 2497(JBW), 2005 WL 1521185, at *16 (E.D.N.Y. June 22, 2005) (emphasis in original) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)). This is because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* (internal citation omitted). However, the Supreme Court has made clear that the statute does not "bar an employee from using the prior acts [that are untimely] as background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113.

Therefore, because plaintiff filed the EEOC charge on February 24, 2011, any acts occurring on or after April 30, 2010, are timely under Title VII. Earlier acts, such as the May 2008 reassignment and alleged lack of promotion in November 2008, are time-barred, but they may be used as background evidence.[5]

#### 2. Title VII Discrimination Claims

Defendants argue that plaintiff cannot establish a prima facie case of race or national origin discrimination, and, in any event, defendants had legitimate, non-discriminatory reasons for any adverse employment actions, and no rational jury could find any such actions were a pretext for discrimination. As set forth below, the Court concludes that, even construing the evidence most favorably to plaintiff, no rational jury could find that the reasons for the failure to promote in late 2011/early 2012, or the subsequent termination, were a pretext for discrimination.

##### a. Legal Standard

Title VII prohibits discrimination against an employee based on his or her gender, race, or national origin. *See* 42 U.S.C. § 2000e-2(a). Here, plaintiff claims that defendants discriminated against him on the basis of his race and national origin. The "ultimate issue" in any employment discrimination case is whether the plaintiff

---

[5] At oral argument, plaintiff's counsel did not argue that the earlier claims were not time-barred, or that there was a basis for equitable tolling, but rather confirmed that the earlier acts were in the complaint as background.

has met her burden of proving that the adverse employment action was motivated, at least in part, by an "impermissible reason," *i.e.*, that there was discriminatory intent. *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997). In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case must satisfy the three-step *McDonnell Douglas* test.

First, the plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who performed her job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination (or retaliation). *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 & n.13 (1973) (noting that elements of a prima facie case vary depending on factual circumstances); *Stratton v. Dep't for the Aging for the N.Y.C.*, 132 F.3d 869, 879 (2d Cir. 1997).

Second, if the plaintiff establishes a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." *Stratton*, 132 F.3d at 879; *see also Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142–43 (2000). "The purpose of this step is to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Stratton*, 132 F.3d at 879 (citation and internal quotation marks omitted).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that a reasonable jury could conclude that more likely than not the employer's actions were motivated, at least in part, by a discriminatory reason. *See James*, 233 F.3d at 154; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish her prima facie case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–101 (2003). It is not sufficient, however, for a plaintiff merely to show that she satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell*, 109 F. Supp. 2d at 207–08.

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove[—] particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the

simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

b. Application

Defendants argue that plaintiff cannot establish a prima facie case of race and national origin discrimination in connection with two adverse employment actions, the lack of promotion to DGM and his termination,[6] because plaintiff's misconduct justified the lack of promotion and the discharge, and moreover, plaintiff was not denied a promotion or terminated under circumstances giving rise to an inference of discrimination. In opposition, plaintiff focuses on pretext rather than establishing a prima facie case. Nevertheless, for purposes of this analysis, the Court assumes that plaintiff has satisfied the minimal burden required by *McDonnell Douglas* to make out a prima facie case of discrimination.

Defendants have put forth legitimate, non-discriminatory reasons for the timely adverse employment actions, among others: (1) Lopresti transferred plaintiff from Babylon to Central Control in 2010, with no loss of pay or benefits, change in title, or other negative impact, because of the ongoing dispute with Toolan and the contentious email chain; (2) the LIRR reassigned plaintiff in 2011 as part of a large intradepartmental move involving numerous employees, and plaintiff had a strong background that justified the change; (3) plaintiff was ineligible for the DGM position because he had been disciplined within the previous three years; and (4) the LIRR terminated plaintiff because Kustoff found that plaintiff had violated the LIRR's anti-harassment policy and other code of conduct provisions. *See, e.g.*, *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 217 (E.D.N.Y. 2009) (finding that plaintiff's poor work performance, lack of professionalism, insubordination and inappropriate workplace behavior as reflected in multiple reports and evaluations constituted a legitimate non-retaliatory reason for adverse employment action). Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find race or national origin discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005).

As a threshold matter, plaintiff at times conflates discrimination and retaliation, although the inquiries are distinct. (*See* Opp'n, at 17–18 (arguing that jury could find that 2010 letter of reprimand was retaliatory device and meaningless, and supervisors, who had been sued and served in the instant action, forced Giannotti to portray his relationship with plaintiff as hostile).) Plaintiff's focus on retaliation for protected activity is not probative of whether defendants acted with *discriminatory* intent.

Plaintiff primarily argues that there is a genuine dispute as to whether defendants were motivated by a discriminatory motive because (1) they gave the DGM position to

---

[6] Plaintiff asserts several other adverse employment actions, which defendants argue do not constitute adverse employment actions. (*See* Def. 56.1 ¶¶ 5–7, 24–26, 30–34.) In his opposition, plaintiff only focuses on the delayed promotion in 2008, which is untimely; the lack of promotion to DGM; and the termination. At oral argument, plaintiff confirmed that the adverse actions that are the basis for his Title VII claims are the failure to promote in late 2011/early 2012, and the termination. The Court, therefore, does not specifically address any of the other alleged adverse employment actions as separate causes of action.

Alexopolous, who is Greek and had less experience than plaintiff; and (2) the LIRR terminated plaintiff based on allegations of harassment and discrimination, while Diliberti, who is Italian, only received a warning. (*Id.* at 18.) A plaintiff can raise an inference of discrimination by showing disparate treatment—namely, that a similarly situated employee outside the protected group received more favorable treatment. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). The law does not require the employees to be similarly situated in all respects, but rather requires that they be similarly situated in all material respects. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("A plaintiff is not obligated to show disparate treatment of an identically situated employee."); *accord Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). The Second Circuit has further defined what the term "all material respects" means in this context:

> What constitutes "all material respects" . . . varies somewhat from case to case and, as we recognized in *Norville*, must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness . . . . Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical . . . . The determination that two acts are of comparable seriousness requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated.

*Graham v. Long Island R.R.*, 230 F.3d 34, 40–41 (2d Cir. 2000) (internal quotation marks and citations omitted).

Even viewing the facts and drawing all inferences in his favor, Jagmohan has not presented evidence from which a rational jury could find that these other employees were similarly situated.[7] First, it is undisputed that Alexopolous was not disciplined during the three years before his promotion to DGM. More importantly, plaintiff concedes that he was having issues with Toolan and wrote the emails to Toolan that precipitated Lopresti's letter, and it is undisputed that LIRR policy barred promotions if an employee had been disciplined during the preceding three years. Plaintiff also points to nothing in the record that could possibly support an inference that the letter of discipline stemmed from discriminatory animus, such as improper statements or disproportionate discipline of non-Greeks or non-Italians, or that Greeks or Italians were promoted more frequently than others. Therefore, no rational jury could conclude that defendants' reasons were pretextual. Plaintiff's conclusory and speculative claim that the September 2010 letter was a retaliatory device with little meaning (Opp'n, at 17) does not constitute

---

[7] While the determination of "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury," *Graham*, 230 F.3d at 39, "[t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 568 (2d Cir. 2000), *superseded by statute on other grounds as stated by Jones v. N.Y. State Metro D.D.S.O.*, 543 F. App'x 20 (2d Cir. 2013)).

11

"evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157.

Second, with respect to the discharge and Diliberti, plaintiff simply questions the wisdom of his termination, but he fails to create a triable issue as to whether the proffered reasons for his termination were a pretext for discrimination. The question is not whether defendant's decision to fire plaintiff was correct, but whether it was discriminatory. *See, e.g.*, *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what '*motivated* the employer . . . .'" (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)); *Koleskinow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) ("Where a plaintiff has been terminated for misconduct, the question is not 'whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination.'" (quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff*, No. 07-Civ.-8835, 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008))); *Agugliaro v. Brooks Bros., Inc.*, 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.").

It is undisputed that Giannotti complained about plaintiff in October 2012, that the LIRR investigated the incident, and that the LIRR found that plaintiff had violated its anti-harassment policy and the Maintenance of Equipment Department's code of conduct. (Def. 56.1 ¶¶ 43–52.) There is no evidence that non-Greeks and non-Italians were terminated or disciplined more frequently, nor is there any other type of evidence that could support a reasonable inference of race or national origin discrimination. Moreover, although plaintiff compares himself to Diliberti, there is no evidence that any subordinate ever complained to LIRR management that Diliberti engaged in discriminatory or demeaning behavior against that subordinate. Although plaintiff complained about Diliberti, he was a third party, not the victim. Therefore, because "plaintiff's misconduct is objectively more serious than that of [the] proposed comparator[s], differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment." *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006); *see also Tomasino v. Mount Sinai Med. Ctr. & Hosp.*, No. 97 Civ. 5252, 2003 WL 1193726, at *14 (S.D.N.Y. Mar. 13, 2003) (holding that the comparators were not similarly situated because they did not commit "the most serious of the infractions for which [plaintiff] was discharged").

In sum, viewing the evidence as a whole, it is clear that plaintiff's discrimination claim, at its core, simply rests on the fact that he is East Indian, while others are Greek or Italian. However, plaintiff does not proffer any evidence to support his discrimination claims. Plaintiff's conclusory allegations that he was subject to discrimination cannot create any reasonable inference that discrimination motivated any adverse employment action. *See, e.g.*, *Bryant v. Wynne*, No. 2:07–340–SB–RSC, 2008 WL 4361242, at *14 (D.S.C. Sept. 24, 2008), *aff'd* 318 F. App'x 174 (4th Cir. 2009) (granting judgment for defendant where plaintiff made conclusory assertions, including an allegation that "management had an unspecified history of not hiring

minorities and EEO complainants," and noting that "[p]laintiff offers no specific facts to support these allegations and fails to show how any of them were connected to [the Superintendent's] hiring decision. These unsupported conclusory allegations do not constitute evidence and do not create triable issues of fact").

The Court recognizes that it must proceed with great caution in granting summary judgment in discrimination cases where intent, as drawn from inferences, is a core issue. However, as the Second Circuit has noted, "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). In the instant case, plaintiff relies on pure speculation and has not produced any evidence to support a rational finding by a jury that, more likely than not, discrimination was a motivating factor in the failure to promote him, or his termination. Accordingly, the Court concludes that plaintiff has failed to raise a genuine question of fact as to his Title VII discrimination claims and grants the motion for summary judgment on those claims.

3. Title VII Retaliation Claim

Plaintiff also claims that defendants retaliated against him in response to his complaints of discrimination. Defendants argue that no rational jury could find a causal connection between any alleged protected activity and any adverse action, much less that any protected activity was the but for cause of his termination, or even a motivating factor. As set forth below, the Court agrees and grants summary judgment on the Title VII retaliation claim.

a. Legal Standard

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). The Court evaluates a Title VII retaliation claim under the three-step, burden-shifting framework used for an adverse employment claim, as established by *McDonnell Douglas*. First, a plaintiff must establish a prima facie case of retaliation by demonstrating that "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See* 42 U.S.C. § 2000e-3; *see also Cruz*, 202 F.3d at 566. Informal as well as formal complaints constitute protected activity. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Title VII protects not only those employees who opposed employment practices made unlawful by the statute, but also those who have a "'good faith, reasonable belief that the underlying challenged actions of the employer violated the law,'" even if those actions did not. *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001) (quoting *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999)). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

If the plaintiff is able to establish a prima facie case of retaliation, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the employment action. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (stating that where the plaintiff succeeds in establishing a prima facie case, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory"). If the employer carries that burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that the reasons proffered by the defendant were pretext for retaliatory animus based upon the protected Title VII activity. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Specifically, the plaintiff must establish that "but for the protected activity, [she] would not have been terminated." *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11–CV–3625(MKB), 2013 WL 3968748, at *14 (E.D.N.Y. July 30, 2013); se*e also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (stating that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); *Goins v. Bridgeport Hosp.*, 555 F. App'x 70, 73–74 (2d Cir. 2014) (same).

The Supreme Court has defined an "adverse employment action" in the Title VII retaliation context (distinct from and broader than the standard in the Title VII discrimination context) to mean an action that is "materially adverse" and that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). In particular, "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id*. at 69.

b. Application

Defendants' arguments in favor of summary judgment mirror their arguments on the discrimination claims. In opposition, plaintiff argues that the *Nassar* "but for" standard cannot apply to the Title VII claims. He also contends that a reasonable jury could find causation under the pre-*Nassar* standard,[8] as well as the "but for" standard, because of the temporal proximity between his complaints and the adverse employment actions. (Opp'n, at 21–25.) In an attempt to show pretext, plaintiff argues that the September 2010 letter of reprimand was meaningless and that defendants encouraged Giannotti to mischaracterize his relationship with plaintiff. (*Id.* at 17–18.)

As a threshold matter, it is questionable whether plaintiff actually engaged in protected activity. For a complaint to qualify as protected activity, the plaintiff is "required to have had a good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *McMenemy*, 241 F.3d at 285 (internal alteration omitted). Reasonableness is assessed in light of the totality of the circumstances. *Id.* Mere subjective good faith belief is insufficient.

---

[8] Under the earlier standard, a plaintiff could show pretext "by proving that 'a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action].'" *Hicks v. Baines*, 593 F.3d 159, 164–65 (2d Cir. 2010) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)) (alterations in original).

*Id.* at 16. As discussed *supra* (notwithstanding the Court's decision to analyze the discrimination claims at the pretext stage, rather than review whether a prima facie case exists), there is no evidence from which a reasonable jury could conclude that plaintiff was discriminated against on the basis of race or national origin, and there also is no evidence from which a rational jury could find that plaintiff's belief about discrimination was reasonable and in good faith. Plaintiff's allegations to his supervisors were conclusory, and he points to nothing that could support a reasonable belief that he was being discriminated against because he was East Indian. In any event, as discussed below, plaintiff's Title VII retaliation claim fails to survive summary judgment, even if he did engage in protected activity.

First, contrary to plaintiff's argument that *Nassar* cannot apply because discovery concluded before defendants filed the instant motion, *Nassar* applies because the case remains open on direct review.[9] *See Sass v. MTA Bus Co.*, --- F. Supp. 2d ---, No. 10-CV-4079 (MKB), 2014 WL 585418, at *5–6 (E.D.N.Y. Feb. 14, 2014) (concluding that new standard for retaliation applies retroactively to all cases still open on direct review and noting that Supreme Court applied new standard in *Nassar* itself); *cf. Gill v. Calescibetta*, 157 F. App'x 395, 397 (2d Cir. 2005) (remanding grant of summary judgment as to First Amendment retaliation claim where intervening decision changed standard for demonstrating retaliatory conduct). Second, plaintiff focuses on the temporal proximity between any protected activity and the adverse employment actions. Even if temporal proximity were enough to establish a prima facie case of retaliation, that is insufficient by itself to overcome a non-discriminatory reason by demonstrating pretext. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."); *Ragusa v. Malverne Union Free Sch. Dist.*, 582 F. Supp. 2d 326, 349–50 (E.D.N.Y. 2008) (temporal proximity alone is insufficient to show that defendant's reasons were merely pretext for retaliation).

Even viewing the facts most favorably to plaintiff, the court concludes that summary judgment on the Title VII retaliation claim is warranted. As discussed extensively above, defendants have put forth evidence of a legitimate, non-retaliatory reason for their action, and plaintiff has not "responded with facts sufficient to warrant a reasonable jury finding by a preponderance of the evidence that the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for [retaliation]." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. 2010) (internal quotation marks omitted).

Plaintiff's arguments to support his position are unpersuasive. The fact that the performance improvement recommendations in Lopresti's letter were not pursued does not create a reasonable inference that the discipline was illusory or was issued with a retaliatory motive, instead of in response to plaintiff's issues with Toolan. Further, although plaintiff implies that defendants encouraged Giannotti to pursue his complaint and told him to mischaracterize the situation, there is no factual support for that assertion in the record. Plaintiff admits

---

[9] In any event, for all the reasons discussed herein, plaintiff's claim could not survive even under the more liberal, pre-*Nassar* standard.

15

that Giannotti complained in October 2012, which explains why any investigation would have been close in time to some of plaintiff's allegedly protected activity. Thus, plaintiff only speculates that defendants retaliated against him by improperly influencing Giannotti. Accordingly, because the record demonstrates that, apart from his speculative suspicions, plaintiff cannot link the adverse employment actions to any retaliatory motivation, the Court grants defendants' motion for summary judgment on the Title VII retaliation claim. *See, e.g.*, *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."); *Kaur v. N.Y.C. Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) (granting motion for summary judgment on retaliation claim, where plaintiff "failed to offer evidence from which a reasonable fact-finder could conclude that her treatment by Defendant was motivated by retaliatory animus . . . [and] failed to link any action on behalf of Defendant to a retaliatory motivation"); *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 269–70 (E.D.N.Y. 2009) (granting motion for summary judgment on retaliation claim, where plaintiff "could not rebut defendants' legitimate, non-discriminatory reasons proffered for their actions through evidence that the reasons are pretextual, or that retaliatory animus was nevertheless a motivating factor").

C. <u>First Amendment Retaliation Claim</u>

Plaintiff brings his First Amendment claim pursuant to 42 U.S.C. § 1983. A cause of action under Section 1983 is "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). To succeed on a § 1983 claim, a plaintiff must prove "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). A municipal entity may be treated as a "person" for purposes of imposing liability under Section 1983 where the plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). However, the municipal entity may be held liable only where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691.

To succeed on a First Amendment retaliation claim, a public employee first must establish a *prima facie* case by showing: "(1) [she] engaged in constitutionally protected speech because [she] spoke as [a] citizen[] on a matter of public concern; (2) [she] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008). The defendant, however, may still "escape liability if [the defendant] can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Id.* The latter is known as the "*Pickering* balancing test" and is a question of law. *See Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (referring to *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568

(1986)). Even if the defendant prevails on the *Pickering* test, the plaintiff may succeed by showing that the adverse action was in fact motivated by retaliation and not by any fear of a resultant disruption. *See Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006).

Defendants argue that plaintiff did not speak as a citizen on matters of public concern. As set forth below, the Court grants summary judgment to defendants because the undisputed facts establish that plaintiff spoke as an employee and not as a citizen.

1. Legal Standard

A plaintiff alleging retaliation must establish speech protected by the First Amendment. *Sousa v. Roque*, 578 F.3d 164, 169–70 (2d Cir. 2009) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)). The threshold inquiry is "whether the employee spoke as a citizen on a matter of public concern." *Id.* at 170 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). This test contains two separate requirements, both of which must be met: (1) the employee must speak as a citizen, rather than as a public employee; and (2) the employee must speak on a matter of public concern. *Id.* ("If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'" (quoting *Garcetti*, 547 U.S. at 418)).[10] In discussing this inquiry, the *Garcetti* court explained that

> [r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

547 U.S. at 421–22.

By expressly holding that speech pursuant to a public employee's official duties is not insulated from employer discipline, *Garcetti* thus directs a court's attention to the role the speaker occupied. *Kelly v. Huntington Union Free Sch. Dist.*, No. 09-CV-2101 (JFB)(ETB), 2012 WL 1077677, at *11 (E.D.N.Y. Mar. 30, 2012) (citations omitted). Although the Supreme Court did not set forth specific criteria for determining when speech is made pursuant to an employee's official duties, it instructed that the inquiry "is a practical one[,]" because "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25. The Court also noted that speech by a public employee retains some possibility of First Amendment protection when it "is the kind of activity engaged in by citizens who do not work for the government." *Id.* at 423; *see Jackler v. Byrne*, 658 F.3d 225, 238 (2d Cir. 2011).

Since *Garcetti*, lower courts have developed more guidelines for determining whether speech is made pursuant to a public employee's official duties. Courts may consider the following factors, none of which are dispositive: the plaintiff's job

---

[10] In *Sousa*, the Second Circuit explained that "[w]hether or not speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record, and while motive surely may be one factor in making this determination, it is not, standing alone, dispositive or conclusive." 578 F.3d at 175. This Court need not address the "matter of public concern" requirement because the undisputed facts demonstrate as a matter of law that plaintiff spoke as an employee pursuant to his official duties.

description; the persons to whom the speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment. *See Caraccilo v. Vill. of Seneca Falls*, 582 F. Supp. 2d 390, 405 (W.D.N.Y. 2008). As indicated by *Garcetti*, two relevant factors that, considered in isolation, are not dispositive are whether the speech occurred in the workplace and whether the speech concerned the subject matter of the employee's job. *See* 547 U.S. at 420–21; *accord Abdur-Rahman v. Walker*, 567 F.3d 1278, 1282 (11th Cir. 2009).

2. Application

In his opposition, plaintiff narrows his First Amendment claim to his comments about the preferential treatment Toolan gave DeLuca. Plaintiff claims this corruption was a matter of public concern because it involved financial harm to the LIRR, a public entity, and he contends that it was beyond the scope of his duties to oversee train maintenance. (Opp'n, at 28.)

Plaintiff's resume states that he was "responsible for administration and oversight of contracts (snow removal, toilet servicing, and car wash)." (Resume, Reply Ex. A, at 3.) Given his job description and his duties, it is absolutely clear that his reporting of allegedly unlawful preferential treatment to a vendor, that he observed as part of his oversight duties, was being reported pursuant to his official job duties. This is so even if the job description did not explicitly include that requirement. The Second Circuit has made clear that "under the First Amendment, speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 202 (2d Cir. 2010) [hereinafter *Weintraub II*]; *accord Nagle v. Marron*, 663 F.3d 100, 106–07 (2d Cir. 2011). Speech is "pursuant to" an employee's official duties especially when, *inter alia*, the speech is a "means to fulfill" and "undertaken in the course of performing . . . his primary employment responsibility." *Weintraub II*, 593 F.3d at 203; *see Portelos v. City of New York*, No. 12-CV-3141(RRM)(VMS), 2013 WL 789460, at *1 (E.D.N.Y. Mar. 1, 2013) (detailing *Weintraub II* standard). Here, it is undisputed that plaintiff learned of the issues with DeLuca through his work in Babylon. Thus, he could complain about the improprieties only because of information he obtained while working as a public employee at the Babylon yard.

In addition, plaintiff reported his concerns to Toolan and Lopresti, not persons outside of the LIRR. In such circumstances, "when a public employee airs a complaint or grievance, or expresses concern about misconduct, to his or her immediate supervisor or pursuant to a clear duty to report imposed by law or employer policy, he or she is speaking as an employee and not as a citizen." *Weintraub v. Bd. of Educ.*, 489 F. Supp. 2d 209, 219 (E.D.N.Y. 2007) [hereinafter *Weintraub I*]; *see also Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006) (holding that retaliation claim failed because plaintiff admitted she had employment duty to ensure accuracy and completeness of student files and report mismanagement or fraud encountered therein); *Rodriguez v. Laredo Indep. Sch. Dist.*, 82 F. Supp. 2d 679, 686–87 (S.D. Tex. 2000) (finding that assistant superintendent's reporting of testing irregularities to supervisor and board and insistence that such practices be discontinued was unprotected speech, although it implicated matters of public concern, because remarks were uttered in employee's professional capacity during dealings with other educational professionals, she admitted she was

obligated to perform duties as part of responsibilities for curriculum and program accountability, and complaints only were aired internally). Therefore, this fact also supports the conclusion that plaintiff's complaints about Toolan were not protected speech. *See Kelly*, 2012 WL 1077677, at *13 (reasoning that fact that plaintiff teacher directed speech at school administration and supervisors, rather than news media or third parties, weighed in favor of defendants); *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582, 2012 WL 3890599, at *3–4 (S.D.N.Y. Sept. 6, 2012) (noting that several courts hold that speech made through internal channels and without a relevant civilian analogue is not speech as citizen and therefore is unprotected).

In sum, although no single factor is dispositive, the uncontroverted facts demonstrate that plaintiff spoke as a public employee, rather than as a citizen, when he complained about Toolan's treatment of DeLuca. Therefore, the individual defendants did not unconstitutionally retaliate against plaintiff under the First Amendment, and the LIRR also cannot be held municipally liable because there is no underlying constitutional violation. Accordingly, the Court grants summary judgment to defendants on the First Amendment retaliation claim.[11]

---

[11] Because speech as an employee is not protected, the Court need not determine whether the speech involved a matter of public concern or conduct the *Pickering* balancing analysis. *See, e.g.*, *Jackler*, 658 F.3d at 237 ("If the employee did not speak as a citizen, the speech is not protected by the First Amendment, and no *Pickering* balancing analysis is required."). Defendants do not argue that issues with the DeLuca contract would not be matter of public concern. Regardless, to allow the public concern factor to trump the others would swallow the Supreme Court's instruction that the inquiry is a "practical one." *Garcetti*, 547 U.S. at 424; *cf. Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008) ("[A] public employee may not transform a personal

### D. State Law Claims

Plaintiff's complaint also asserts claims under New York law. Having determined that the federal claims do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

---

grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run.'" (quoting *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007))).

Briefly, the Court also concludes that plaintiff does not show that any adverse employment actions, for which defendants have proffered legitimate, non-retaliatory reasons, were in fact motivated by retaliation. Any link between plaintiff's complaints and these employment actions is speculative at best. The record evidence discussed *supra* indicates that plaintiff's issues with Toolan extended beyond the DeLuca contract, and neither Lopresti's September 2010 letter, nor any of the events associated with the other adverse employment actions, mentions DeLuca. Therefore, other than the temporal proximity between the complaints and the 2010 transfer, which the Court concludes is insufficient standing alone to defeat summary judgment, there are no facts from which a reasonable jury could reasonably infer, much less conclude, that defendants retaliated against plaintiff for his complaints. *See Lyman v. NYS OASAS*, 928 F. Supp. 2d 509, 527 (N.D.N.Y. 2013) ("The relevance of temporal proximity in a particular First Amendment retaliation case turns on its unique facts and circumstances."). Accordingly, defendants are entitled to summary judgment on the First Amendment retaliation claim on this ground, as well.

19

Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiffs' state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Liz Claiborne, Inc.*, No. 99 Civ. 3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment as to the federal claims. The Court declines to exercise supplemental jurisdiction over the state law claims and, thus, dismisses such claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 8, 2014
       Central Islip, NY

\* \* \*

Plaintiff is represented by Matthew Scott Porges, 641 President Street, Suite 205, Brooklyn, NY 11215. Defendants are represented by Brian Kenneth Saltz of The Long Island Railroad Company, Jamaica Station, Mail Code 1143, Jamaica, NY 11435.